# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
## 3:09cv440

| | |
|---|---|
| METROPOLITAN GROUP, INC., | )<br>) |
| Plaintiff, | )<br>) |
| Vs. | ) ORDER<br>) |
| MERIDIAN INDUSTRIES, INC., | )<br>) |
| Defendants. | )<br>) |

**THIS MATTER** is before the court on defendant's Motion for Summary Judgment (#39). Having considered defendant's motion, plaintiff's Response, and defendant's Reply, and conducted a hearing on April 18, 2012, the court enters the following findings, conclusions, and Order.

## FINDINGS AND CONCLUSIONS

### I.  Factual Background

#### A.  Nature of the Action

On July 19, 2006, two corporate entities entered into an agreement for the sale and transfer of commercial real property in Belmont, North Carolina, on which a textile mill had been located for a century. There is no dispute that each party was "sophisticated," that they were at all times represented by counsel, and that the parties employed experts to assist them in reviewing the environmental aspects of the transaction.

The seller, Meridian, had previously operated a textile dyeing plant on the property, although it had ceased operations nearly three years prior to the sale. The buyer, Metropolitan Group, Inc. ("Metropolitan"), bought the property intending to demolish the buildings and construct residential units on the site. After nearly two years of due diligence, Metropolitan closed on the property on September 8, 2006.

Less than a year after closing, Metropolitan's demolition contractor ruptured a fuel line on the site. The rupture resulted in an oil spill into the Catawba River, for which the contractor was

criminally charged and convicted. As a result of the ensuing criminal investigation, chemicals and other hazardous materials were discovered on the property. Among these were chemicals stored behind a wall in the plant, the existence of which neither plaintiff, defendant, nor their environmental experts were aware of prior to demolition, according to the evidence before the court.

In this action, Metropolitan alleges fraud, unfair and deceptive practices, trespass, breach of contract, and breach of warranty. The lynchpin to such claims is Metropolitan's claim that Meridian had "actual knowledge" of chemicals, asbestos, and fuel oil on the property at the time it sold the property, but made representations to the contrary to Metropolitan. Meridian has also asserted a counterclaim contending that Metropolitan failed to facilitate its continued access to the property under the contract so that Meridian could monitor groundwater wells on the site. Meridian contends that in demolishing and clearing the property after the sale, Metropolitan destroyed Meridian's groundwater monitoring wells. Meridian has moved for summary judgment on all of Metropolitan's claims and on its own counterclaim. At the hearing, Meridian conceded for the first time that it was in breach of the contract as it conveyed the property knowing that asbestos was present.

**B.      Undisputed Facts**

**1.      Prior Use and Sale of the Plant Property**

Until June 2003, Meridian operated a textile dyeing plant on the Property (the "Belmont Dyers Plant"). Whisnant Dep. 13:22-25, Setliff Dep. 11:11-12, 23:13-15. 1. After ceasing operations, Meridian transported chemicals that were useful to its plant in Valdese, North Carolina. Whisnant Dep. 14:1-9, 16:1-6, 16:14-21, Setliff Dep. 23:21-25:4, Queen Dep. 8:16-24. While plaintiff argued at the hearing that employees of defendant knew on the date of closing that chemicals remained at the plaint, every Meridian employee who testified in this action believed that the chemicals not taken to Valdese would be discarded and removed from the Property. Whisnant Dep. 16:16- 21, 17:11-13, 39:6-18, Setliff Dep. 26:20-27:7, Queen Dep. 17:24-18:9, 39:16-9, Jacobson Dep. 19:5-17.

## 2. Inspection and Remediation

In May 2004, Meridian entered into an agreement with Robert Dunn ("Dunn"), a real estate broker associated with The Stump Corporation, for Dunn to list and either sell or lease the Property on behalf of Meridian. Dunn Dep. Ex. 3, Ex. 10. As part of its efforts to sell the Property, Meridian, through its environmental consultant, Derr Leonhardt ("Leonhardt") of Leonhardt Environmental, P.C., hired a licensed asbestos removal company to remediate the asbestos on the Property. Metro 000008-29, Ex. 11. 1 Deposition transcripts attached as Exs. 1-9.

On October 15, 2004, Leonhardt inspected the asbestos removal work and confirmed that there remained "no visible, friable asbestos at the facility." Leonhardt cautioned, however, that the facility is not "asbestos free." Id. at Metro 000008.

## 3. Offer and Option to Purchase

On April 12, 2005, Metropolitan, through its President James Gross ("Gross"), offered to purchase the Property for the amount of $1,000,000.00 and requested an inspection period of 120 days "to determine the feasibility of the Property for Purchaser's intended use, to obtain financing for the Property, and to conduct its own tests, inspections and studies of the Property as it deems necessary." Dunn Dep. Ex. 8, Ex.12. Gross testified that he wanted to purchase the Property so that he could demolish it and construct residential buildings on the site. Gross Dep. 11:18-20, 12:3-8, 50:13-20.

On April 28, 2005, the parties entered into the Option to Purchase Agreement (the "Option") whereby Meridian agreed to sell and Metropolitan agreed to purchase the Property for the sum of $1,000,000 after an inspection period of 120 days. Metropolitan 000019-21, Ex. 13. In the Option, Meridian disclosed

> that it ha[d] previously had certain asbestos removed from the Property, although it believes asbestos-containing materials may still be present in the building located on the Property, including specifically within the roof of the building located on the Property. In light of the age of the buildings located on the Property, [Meridian] acknowledges it is probable asbestos still is present on the Property.

Id. at ¶6. The Option further provided that Metropolitan had "the right to enter upon the Property

for the purpose of inspecting, surveying, appraising, and/or otherwise examining the Property." Id. at ¶7. Metropolitan retained an environmental consulting engineer, William Sullivan of Geoscience ("Sullivan"), to perform a review of environmental studies and reports pertaining to the Property. Metropolitan did not authorize Sullivan, or anyone else, to perform an independent environmental assessment of the Property. Sullivan Dep. 39:23-40:16, Gross Dep. 27:21-28:6. Meridian offered its environmental consultant, Leonhardt, as a contact and resource for Sullivan. Metro 000238-239, Ex. 14, Sullivan Dep. 62:16-25, 63:1-7, 95:14-17.

### 4. Presale Access, Opportunity to Inspect, and Exchange of Information

Meridian gave Gross and Sullivan access to the Property from the time it first expressed an interest in the Property through Closing. Gross Dep. 26:8-17, 44:12-45:1, 48:15-49:19, 52:4-7, Sullivan Dep. 28:13-25, 70:15-21. Gross and Sullivan entered the Property on multiple occasions prior to sale and Closing. Metropolitan's Response to Meridian's First Request for Admissions, No. 3, Ex. 15, Sullivan Dep. 18:9-16, 70:15-21, Gross Depo. 24:13-25, 25:24-26:17, 31:9-11.

On June 2, 2005, Leonhardt provided Sullivan a summary of the operations conducted at the Belmont Dyers Plant. Meridian00000737-739, Ex. 16. Sullivan forwarded this information to Gross. Metro 000234, Ex. 17. Throughout 2005, Meridian provided additional environmental reports and data to Metropolitan, including information about Meridian's prior use of chemicals and other hazardous materials, as well as the presence of fuel oil and asbestos on the Property. Metro 000228-29, Meridian 00000748, Metro 000225-27, Exs. 18-20, Gross Dep. 38:19-39:19, 40:14-20.

On July 14, 2005, Sullivan sent a letter to Gross summarizing his review of ten environmental reports and permits provided to him by Meridian regarding the environmental condition of the Property. Metropolitan 000277-290, Ex. 21. Sullivan's summary included the following:

    a.    An analysis of a Spill Prevention Control and Countermeasure Plan prepared by Leonhardt for Meridian in 2003, which showed storage and use of fuel oil. Id. at

        Metropolitan 000283-286.

    b.    An analysis of a Stormwater Pollution Prevention Plan prepared by Leonhardt in 2003, which showed the presence of boiler chemicals, lubricants, dye chemicals, fuel oil #2, and other materials. Id. at Metropolitan 000286-287.

    c.    An analysis of a Tier 2 Emergency and Hazardous Chemical report from 2004 showing the existence of a "10,000 gallon #2 fuel oil tank located outside the boiler room." Id. at Metropolitan 000287.

    d.    An analysis of an Asbestos Closure Report prepared by Carolina Abatement Technologies in 2004 showing that residual asbestos "remains in selected elements of roofing material and in selected wall panels." Id. at Metropolitan 000287-288.

Included with these reports was Leonhardt's October 15, 2004 letter noting that "it is possible that small amounts of asbestos containing material may remain hidden" on the Property. Metropolitan 000277-290, Metro 000008-29, Exs. 21, 11. On February 14, 2007, Gross' attorney, Sal Balsamo, admitted that Gross had

> received the Leonhardt report in advance of closing and was on notice that there was the possibility that there was asbestos located within the confines of the mill…As indicated in the report, [Gross] was able to determine that there was, in fact, asbestos located in parts of the mill that were hidden or locatable only upon demolition.

Meridian00003721, Ex. 22. Gross testified that he factored the cost of demolishing the buildings and removing asbestos into the purchase price for the Property, and even solicited bids from demolition companies during the Option period. Gross Dep. 20:3-24, 23:14-19. He further admitted that his plan all along was to demolish everything on the Property, including "below the pavement." Gross Dep. 50:16-20. Gross never asked Sullivan to determine the extent of asbestos that remained on the Property. Sullivan Dep. 90:21-24.

On August 26, 2005, Leonhardt sent an email to Sullivan responding to questions raised in the July 14, 2005 Sullivan Letter and during an August 8, 2005 meeting. Sullivan Dep. 95:18-96:1, Meridian 0000874-891, Ex. 23. By separate cover, Leonhardt mailed a site map of the Property to Sullivan outlining the location of chemical storage areas, fuel tanks, and groundwater monitoring

wells. WS0001147, Ex. 24, Leonhardt Dep. 57:1-58:20, 85:3-86:22.

**5.     Purchase Agreement**

After extending the Option several times, the parties entered into the Agreement for Purchase and Sale of the Property (the "Purchase Agreement") on July 19, 2006, for the amount of $1,000,000.00. Metropolitan 00028-37, Ex. 25, Dunn Dep. 93:13-21. The Purchase Agreement included the following provisions:

a. Meridian represented that it had "no actual knowledge of the presence or disposal within the buildings or on the Property of hazardous or toxic waste or substances," including, among other materials, "petroleum" and "asbestos." Ex. 25, Purchase Agreement § 7.

b. "Actual knowledge" was negotiated, agreed to, and defined as the "the current, actual conscious knowledge of the officers and employees of Meridian Dyed Yarn Group." Id. None of the Meridian employees or former employees who testified in this action have stated that they had "actual knowledge" of the presence of chemicals or other hazardous materials at the time of the sale. Whisnant Dep. 39:6-11, Setliff Dep. 26:20-27:7, Queen Dep. 39:16-19, Jacobson Dep. 19:13-17.

c. Metropolitan has the right to terminate the Purchase Agreement if the Property was not in "substantially the same condition" as of the date of Metropolitan's original offer. Id. §6(e). Metropolitan did not avail itself of this right. Metropolitan 000024-25, Metropolitan 000044 Exs. 26-27.

d. Metropolitan has the right to assign its obligations under the Purchase Agreement to any party owned by, controlled by, or under common ownership with Metropolitan without obtaining Meridian's permission or to any other party with Meridian's written consent. Id. Para. 16. Metropolitan did not avail itself of this right. Anderson Dep. 22:24-23:11, Gross Dep. 72:19-73:11.

Gross testified that at no time during their inspections of the Property prior to Closing did he or Sullivan observe totes, drums, or other containers containing dyeing chemicals. Gross Dep. 25:5-23. He further admitted that while he identified an aboveground fuel tank on the Property, he never determined whether the tank contained any fuel, even prior to hiring a contractor to demolish the Property. Id. 27:10-20, 65:10-17. Gross also testified that "there was never a representation that all of the asbestos was gone. I was aware of that." Id. 38:15-17.

### 6. Presale Discovery and Disclosure of Groundwater Contamination

On April 14, 2005, Meridian, through John Reuscher of Mid-Atlantic Associates ("Mid-Atlantic") and Leonhardt, notified NCDENR that it had identified certain hazardous substance contamination in the groundwater on the Property, as reflected in an October 11, 2004 study, and had installed groundwater monitoring wells on the Property to address the issue. Metro 000030-94, Ex. 36.

On May 23, 2005, Sullivan emailed Gross about the October 11, 2004 Groundwater Report, the presence of groundwater wells on the Property, and his meeting with Mid-Atlantic to discuss the groundwater contamination issues. Gross responded that "based on what they are telling me, all that has been done environmentally is 3 or 4 wells have been drilled." Metro 000246, Ex. 37, Gross Dep. 38:19-39:19, 40:14-20.

On February 13, 2006, Meridian submitted to NCDENR a proposed Corrective Action Plan (the "CAP") outlining the process for monitoring the groundwater contamination on the Property on a semi-annual basis, and noting the presence of six permanent wells on the Property. Metropolitan 000134-155, Ex. 38. On May 5, 2006, NCDENR gave Final Approval for the CAP. Metropolitan 000132-133, Ex. 39. In the Purchase Agreement, the parties acknowledged "Certain Hazardous substance contamination identified in the groundwater at the Property," and Meridian retained responsibility for performance of the CAP. Metropolitan 00028-37, Ex. 25 at § 7. In turn, Metropolitan was required "to reasonably cooperate with [Meridian] to facilitate" access to the Property and the groundwater under the Property (which access existed through groundwater

monitoring wells) in order for Meridian to perform its approved CAP. Id.

### 7. Closing

On September 8, 2006, the parties closed on the real estate transaction (the "Closing") and Metropolitan took possession of the Property. Metropolitan 000024-25, Metropolitan 000044, Exs. 26-27.

### 8. Demolition and Fuel Spill by Plaintiff's Contractor, Danny Still

Soon after closing, in October 2006, Gross hired Danny Still of Still's Services (collectively "Still") to demolish the Property. Metropolitan 000322-323, Ex. 28, Gross Dep. 57:23-25, 59:21-22. The contract between Still and Gross, which included specific instructions for Still, did not mention the existence of a fuel tank, fuel oil, or groundwater monitoring wells. Metropolitan 000322-323, Ex. 28. Gross testified that he didn't know for sure whether he had discussed the possibility that fuel oil remained on site with Still prior to the demolition, but he did point out the fuel tank to him. Gross believed that Still was aware of the fuel oil though because he had salvage rights and had approached potential buyers. Gross Dep. 27:10-20, 65:24- 66:3; 100:9-15, 100:24-101:8; Petitioner's Prehearing Statement, Ex. 29. In February 2007, Metropolitan and Still received a Notice of Violation from the North Carolina Department of Health and Human Services for failing to properly inspect the Property for the presence of asbestos prior to beginning demolition activities. The Notice stated that "regulated asbestos containing material had been disturbed at the facility and left lying on the floor and surrounding area of one of the manufacturing buildings not yet demolished." Metropolitan 000373-374, Ex. 30.

On February 6, 2007, Still caused the collapse of a retaining wall near the fuel tank leading to the discharge of fuel oil into the Catawba River. Petitioner's Prehearing Statement, Metropolitan 000121-122, Government's Response to Defendant's Sentencing Memorandum at 2, Exs. 31-32, Gross Dep. 66:15-17. The federal government determined that Still drove his demolition equipment in a recklessly negligent manner too close to an adjacent retaining wall, causing the retaining wall

to collapse which in turn severed the fuel line of the aboveground fuel tank. Still did not notify the authorities of the spill, instead sending an employee to purchase cat litter to try to absorb the fuel oil and to prevent it from flowing into the storm drain. A resident downstream from the spill reported the spill to the authorities after the oil covered boats and the shoreline. Government's Response to Defendant's Sentencing Memorandum at 2, September 8, 2010; Judgment, Exs. 32-33. Gross testified that Still's response to the spill was "particularly stupid," Gross Dep. 100:4-8, and admitted that Still could have saved a lot of money in clean up costs had he reacted quicker. Gross Dep. 100:9-15. In 2009, Still pleaded guilty to one federal criminal charge in violation of the Clean Water Act and was sentenced to eight months in a federal prison. Superseding Bill of Information, September 8, 2010 Judgment, Exs. 34, 33.

### 9. Discovery of Containers on the Property After the Spill

After the fuel spill, the North Carolina Department of Environment and Natural Resources ("NCDENR") identified totes, drums, and other containers of chemicals on the Property. Metropolitan 000360-365, Ex. 35. Gross had never seen these containers during his multiple inspections.

### 10. Further Demolition by Plaintiff's new Contractor, "Big Dog"

In June 2007, Metropolitan hired Big Dog Demolition, Inc. ("Big Dog") to replace Still and finish the demolition of the Property. Metro 000002-3, Ex. 40. Among the "scope of work" for Big Dog was:

    a.     "Demolish all structures, foundations, fencing walls, asphalt, paving, silos, and slabs;"

    b.     "All inert debris will be crushed and remain onsite;"

    c.     "All disturbed areas will be smoothed and Hydro-seeded."

Id. Metropolitan did not inform Big Dog that the Property contained groundwater monitoring wells or otherwise instruct Big Dog to avoid the wells as part of its demolition. Metro 000002-3, Metropolitan's Amended Responses to Meridian's First Set of Interrogatories, No. 13, Exs. 40-41,

Anderson Dep. 16:16-20.

By late 2007, Big Dog had demolished the buildings on the Property but, because of a dispute with Gross, failed to remove the debris, which remained "stacked up" on the Property in piles "probably 20 feet tall." Gross Dep. 109:4-10, Anderson Depo. 32:3-33:16, 37:10-38:5, 41:20-44:8, Leonhardt Dep. 16:17-25, Meridian00003866, Ex. 42. During this time period, Metropolitan was cited with violating various environmental regulations. For example, in November 2007, Metropolitan received a $5,000 fine for failing to have an Approved Erosion Control Plan in place prior to commencing demolition work. Metro 000184-185, Ex. 43. In May 2008, Metropolitan received a Notice of Violation regarding the stormwater detention on the Property. Metro 000197, Ex. 44. In October 2008, NCDENR contacted Metropolitan regarding crushed concrete and brick being disposed of improperly into excavated holes on the Property. Metro 000199-201, Ex. 45.

### 11. Access to and Destruction of Monitoring Wells

Between the Closing and May 2008, Meridian performed its ongoing duties under the CAP by testing the groundwater wells on a semi-annual basis. Beginning in May 2008, however, Meridian was unable to perform its semi-annual review because four of the groundwater monitoring wells on the Property had been destroyed. Leonhardt Dep. 90:11-91:14, Meridian00003866, Meridian00002852-2853, Exs. 42, 46. When Meridian advised Metropolitan of this issue, Metropolitan refused to repair or replace the wells. Metropolitan Group, Inc.'s Response to Meridian Industries, Inc.'s First Request for Admission, Response No. 15, Ex. 15. Instead, Metropolitan's attorney, Rick Kane, provided insurance information for Big Dog, and Meridian thereafter filed a claim, to no avail. Meridian 00004350, Meridian 00004357, Exs. 47-48. Ultimately, Meridian paid for and replaced four of the groundwater monitoring wells in February 2009, resulting in out-of-pocket expenses of $36,821.38 to Meridian. Leonhardt Dep. 91:6-14, Meridian00002852-2853, Ex. 46.

In or around August 2009, one of the monitoring wells was again covered with debris and rubble. Meridian00003866, Leonhardt Defendant's Dep. Ex. 1, Exs. 42, 49, Leonhardt Dep.

90:11-91:14. Then, in or around July 2010, all of the groundwater monitoring wells, both the original wells and those replaced in February 2009, were completely destroyed or rendered inaccessible. Id. Meridian has shown without dispute that it has been unable to perform its semi-annual testing of the groundwater on the Property under the CAP since this time. Id.

On December 22, 2010, NCDENR sent Metropolitan a Notice of Violation informing Metropolitan that the destruction of the groundwater monitoring wells on the Property constituted a failure to abandon a well and failure to submit records of well abandonment, both in violation of North Carolina well construction standards. Metro 000165-166, Ex. 50.

## II. Applicable Standard

Rule 56(a), Federal Rules of Civil Procedure, provides:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed.R.Civ.P. 56(a). The rule goes on to provide procedures for plaintiff to use in responding to a Motion for Summary Judgment:

> **(c) Procedures.**
> **(1) Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> **(2) Objection That a Fact Is Not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> **(3) Materials Not Cited.** The court need consider only the cited

> materials, but it may consider other materials in the record.
>
> **(4) Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. 56(c).

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*." Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. Anderson, supra. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his or her favor. Anderson, supra, at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id., at 252.

## III. Discussion

### A. Summary Judgment as to Metropolitan's Breach of Contract Claim

Metropolitan contends that Meridian breached the Purchase Agreement by representing that it had no "actual knowledge" of the presence or disposal of asbestos, fuel oil, or other hazardous or toxic substances. First Amended Complaint (#18). As mentioned above, Section 7 of the Purchase Agreement defines "actual knowledge" as "the current, actual conscious knowledge of the officers and employees of Meridian Dyed Yarn Group." Id. At the hearing, Meridian conceded breach of the contract as to asbestos – thus, summary judgment will be denied as to Meridian and granted in favor of Metropolitan as to breach of contract concerning asbestos, leaving damages for trial.

To otherwise survive summary judgment on a breach of contract claim, plaintiff must show that a genuine issue of material fact exists as some element of its claim requiring resolution by a jury. In North Carolina, breach of contract requires showing:

(1) a legal obligation of defendant to plaintiff;

(2) a violation or breach of that right or duty; and

(3) a consequential injury or damage to the defendant.

See generally Investment Properties v. Norburn, 281 N.C. 191 (1972). Under North Carolina law,

> [w]hen the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court[,] and the court cannot look beyond the terms of the contract to determine the intentions of the parties.

Piedmont Bank & Trust Co. v. Stevenson, 79 N.C.App. 236, 240 (internal citations omitted), aff'd per curiam, 317 N.C. 330 (1986). Thus, '[i]t must be presumed the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it

purports to mean." Hartford Accident & Indemnity. Co. v. Hood, 226 N.C. 706, 710 (1946) (internal citations omitted).

In this case, Metropolitan's claim pivots on the defined language of the contract, wherein the parties expressly chose to define "actual knowledge" as "current" with the date of the Purchase Agreement, which was July 19, 2006. Thus, plaintiff's obligation is to come forward with some evidence to show that such provision was breached on that date. Review of the response reveals no evidence that Meridian had "actual knowledge" of the presence of chemicals and other hazardous materials (excepting asbestos) on the Property on such date. See #39-1, Ex. 25 § 7. Considering the evidence in a light most favorable to the party resisting summary judgment, all that Metropolitan has been able to show is Meridian employees knew chemicals were on the Property at some point prior to sale when Meridian still operated its dye plant or that Meridian employees were informed after the sale that chemicals were discovered as a result of an investigation by NCDENR and the EPA. There simply is no evidence that any employee or officer of defendant knew of the presence on those chemicals on the date of closing.

It appearing that defendant has shown that no genuine issue of material fact remains and that it is entitled to summary judgment as a matter of law on plaintiff's contract claim as to petroleum and hazardous chemicals (other than asbestos), summary judgment will be granted in favor of defendant and against plaintiff on those claims.

### B. Summary Judgment as to Metropolitan's Claim of Fraud

Metropolitan's fraud claim is also based on Section 7 of the Purchase Agreement and Meridian's representation that it lacked "actual knowledge" of the presence or disposal of asbestos, fuel oil, or other hazardous or toxic substances. First Amended Complaint (#18). Metropolitan contends that Meridian committed fraud either by misrepresenting that it lacked "actual knowledge" or by omission through failure to inform Metropolitan of its "actual knowledge." First Amended Complaint (#18). While the asbestos claim has survived summary judgment, there is no evidence that Meridian concealed any knowledge it had as to asbestos and even made substantial pre-sale

disclosures as to the presence of asbestos – thus, the presence of asbestos cannot form the basis of a fraud claim. As discussed above, Metropolitan's failure to come forward with any evidence that Meridian knew of the presence of the chemicals or other hazardous materials on the day of sale is equally fatal to claims of fraud.

The essential elements of a claim of fraud by misrepresentation are: (1) a false representation or concealment of a material fact, (2) that was reasonably calculated to deceive, (3) which was made with the intent to deceive, (4) that did in fact deceive, and (5) resulted in damage. Jolly v. Acad. Collection Serv., 400 F.Supp.2d 851 (M.D.N.C. 2005). To satisfy the specificity requirements of Rule 9(b), it is plaintiff's obligation to plead the time, place, and contents of the false representations, as well as the identity of the person making the representation and what such person obtained thereby. In order to plead fraud by omission, a plaintiff must allege the following:

> (1) the relationship or situation giving rise to the duty to speak, (2) the event or events triggering the duty to speak, and/or the general time period over which the relationship arose and the fraudulent conduct occurred, (3) the general content of the information that was withheld and the reason for its materiality, (4) the identity of those under a duty who failed to make such disclosures, (5) what those defendant(s) gained by withholding information, (6) why plaintiff's reliance on the omission was both reasonable and detrimental, and (7) the damages proximately flowing from such reliance.

Breeden v. Richmond Community College, 171 F.R.D. 189, 195 (M.D.N.C. 1997) (citations omitted).

In this case, Metropolitan admits in its Response that its fraud claim flows directly from its alleged breach of contract claim; however, "'mere failure to carry out a promise in contract does not support a tort action for fraud [or UDTP].'" Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 346–47 (4th Cir. 1998) (quoting Strum v. Exxon Co., U.S.A., 15 F.3d 327, 331 (4th Cir. 1994)). Indeed, there are no substantial aggravating factors shown as it is undisputed that both buyer and seller were sophisticated parties to a commercial transaction, had counsel, were advised by environmental consultants, and had unfettered access to the subject property prior to the sale. As a matter of law, neither of plaintiff's claims of fraud can survive summary judgment. Further, plaintiff cannot come forward with facts upon which a jury could find in its favor on each element

of fraud by misrepresentation or omission as there is no evidence that defendant had actual knowledge beyond that which it disclosed on the date of closing.

Finding that no genuine issue of fact remains for trial, the defendant's Motion for Summary Judgment will be granted as to Metropolitan's fraud claim and judgment will be entered in favor of Meridian on such claim.

**C.  Summary Judgment as to the Breach of Warranty Claim**

The essential elements for a breach of an express warranty claim are: (1) the existence of an express warranty, (2) breach of the express warranty, and (3) damages suffered by the plaintiff as a result of the breach. Besse v. Gen. Motors Corp., 317 F. Supp. 2d 646, 654 n.7 (D.S.C. 2004). Breach of express warranty claims apply only to the sale of goods and not land. Everts v. Parkinson, 555 S.E.2d 667, 677 (N.C. Ct. App. 2001). This claim fails as a matter of well-settled law.[1]

**D.  Summary Judgment as to the Trespass Claim**

Under North Carolina law, the essential elements of a claim for civil trespass are: (1) that the plaintiff was in possession of real property at the time of trespass; (2) that defendant, without authorization, unlawfully entered such real property; and (3) that plaintiff sustained damage as a result of the unlawful entry. Broughton v. McClatchy Newspapers, Inc., 161 N.C.App. 20, 32 (2003). While Metropolitan alleges that Meridian somehow placed chemicals and materials on the property after Metropolitan took possession, there is absolutely no evidence to support such contention. Indeed, Metropolitan has otherwise alleged to the contrary, stating that Meridian left such materials on the property prior to the sale. Finally, Metropolitan has

---

[1] The court notes from the arguments at the hearing that, in addition to claiming a breach of the warranty supplied by the UCC in the sale of goods, plaintiff may be asserting a breach of the covenant of general warranty conveyed by deed. Under North Carolina law, a covenant of general warranty is confined to all lawful claims and demands, and does not extend to wrongful acts of strangers or tortious wrongdoers, and the warranty is not broken until there is an eviction or ouster under a superior title. Shimer v. Traub, 244 N.C. 466, 467(1956). To be actionable, plaintiff must be able to show ouster or eviction under a superior title, otherwise no cause under the covenant of warranty exists. Id. Having not shown ouster, plaintiff has no actionable claim under the common law covenant of warranty in this case.

failed to respond to the Motion for Summary Judgment on the trespass clam.

Meridian having shown that there are no genuine issues of fact as to such claim in dispute and that it is otherwise entitled to judgment in its favor as plaintiff cannot prove each element of a claim for civil trespass, the court will grant summary judgment in favor of defendant on such claim.

### E. Summary Judgment as to the UDPTA Claim

The elements of a claim for violation of the UDTPA are: "(1) an unfair or deceptive act or practice, or an unfair method of competition; (2) in or affecting commerce; (3) which proximately caused actual injury to the plaintiff or his business." N.C. Gen. Stat. § 75-1.1, see Phelps-Dickson Builders, LLC v. Amerimann Partners, 617 S.E.2d 664 (N.C. Ct. App. 2005). An act is "unfair" when it "offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Marshall v. Miller, 276 S.E.2d 397, 403 (N.C. 1981).

A cause of action for unfair and deceptive trade practices under Section 75-1-1 can be a distinct cause of action from breach of contract claim. Branch Banking and Trust Co. v. Thompson, 107 N.C.App. 53, 62 (1992). To do so, however, plaintiff must show "substantial aggravating circumstances attending the breach to recover under the Act, which allows for treble damages." Id. It is "unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." Broussard , 155 F.3d at 347 (citation omitted).

The UDTPA claim, like the fraud and contract claims that precede it, is predicated on Section 7 of the Purchase Agreement and Meridian's alleged misrepresentation that it lacked "actual knowledge." As discussed earlier, plaintiff has come forward with no evidence that

-17-

Meridian had actual knowledge on the date of closing with respect to the presence of chemicals and other hazardous materials on the property. Further, Mer4idian clearly disclosed under the terms of the agreement its knowledge of the presence of asbestos. Thus, the UDTPA claim fails both as a matter of law and substantively as no supporting evidence has been presented.

Meridian having shown that there are no genuine issues of fact as to such claim in dispute and that it is otherwise entitled to judgment in its favor as plaintiff cannot prove each element of a UDTPA claim, the court will grant summary judgment in favor of defendant on such claim.

  **F. Summary Judgment as to Defendant's Breach of Contract Counterclaim**

The language of the Purchase Agreement places certain contractual obligations on Metropolitan with respect to monitoring the groundwater contamination wells as the property:

> Pursuant to correspondence dated May 5, 2006 from the North Carolina Department of Environment and Natural Resources ("NCDENR") to Valdese Manufacturing Co., a Division of Seller, a copy of which is attached hereto as <u>Attachment A</u> (the "NCDENR Letter"), NCDENR granted final approval of a Corrective Action Plan submitted by Seller to NCDENR related to certain Hazardous Substance contamination identified in the groundwater at the Property, subject to ongoing groundwater monitoring obligations, as set forth in the NCDENR Letter (the "Post-Closing Groundwater Monitoring"). Seller hereby agrees to assume and retain responsibility for the Post-Closing Groundwater Monitoring identified in the NCDENR Letter . . . . Seller will coordinate with Buyer to facilitate access to the property at times and under terms that will not unreasonably interfere with Buyer's use of the Property, and Buyer agrees to reasonably cooperate with Seller to facilitate the same.

#39-1, Ex. 25 § 7. In response to Meridian's Motion for Summary Judgment, Metropolitan does not contest that it has repeatedly destroyed the groundwater monitoring wells, that it has been fined or cited by the State of North Carolina for doing so, or that it has refused to reimburse Meridian its costs in replacing the wells. Instead, Metropolitan reasons that such

contract language only obligated them to provide Meridian with reasonable access to the property and nothing more. Response, at 4. It further argues that nothing has prevented defendant from accessing the groundwater, despite its destruction of the test wells, inasmuch as nothing such as a solid parking lot has prevented it from doing so.

While this court recognizes that what constitutes "reasonable access" is usually a jury question, callous destruction of groundwater testing wells that are part of a CAP administered and mandated by a state environmental authority is facially unreasonable. This is especially so where, as here, the plain language of the Purchase Agreement makes the importance of such wells abundantly clear as well as defendant's continuing obligation to monitor the wells. Indeed, the NCDENR letter directing monitoring was attached to the agreement. By destroying the wells, Metropolitan has failed to reasonably cooperate with Meridian to facilitate access to the property for purposes of complying with defendant's obligations under the NCDENR letter. Summary Judgment will be granted in favor of defendant on the counterclaim. Monetary damages will be left for determination by the jury, and the court will consider injunctive relief after the jury returns its verdict. Damages may be mitigated or limited based on a showing by plaintiff that the location of the wells interfered with its reasonable development of the property.[2]

## ORDER

**IT IS, THEREFORE, ORDERED** that defendant's Motion for Summary Judgment (#39) is **GRANTED** in part and denied in part, and **SUMMARY JUDGMENT** is entered in favor of defendant and against plaintiff, as follows:

1. Summary Judgment is granted in favor of defendant and against plaintiff on all claims asserted in the First Amended Complaint, with the exception of the Breach

---

[2] The notes that the wells will have to be placed somewhere, and the court is amazed that the parties have not agreed to with each other and NCDENR as to their placement.

of Contract claim as to asbestos, such claims are dismissed with prejudice, and a judgment shall be entered providing that plaintiff have and take nothing of this defendant on such claims. Summary Judgment is entered in favor of plaintiff as to the asbestos aspects of its Breach of Contract claim, and the issue of damages as to such breach are set for trial;

2. Summary Judgment is granted in favor of defendant and against plaintiff on defendant's Counterclaim for Breach of Contract. Damages shall be determined by a jury at trial.

This matter is set for trial during the June 2012 term. Motions for continuance or peremptory setting should be filed as soon as possible.

Signed: April 23, 2012

Max O. Cogburn Jr.
United States District Judge